**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-156 (JDB)** |
| v. | : | |
| | : | |
| **STEPHEN AYRES,** | : | |
| | : | |
| **Defendant** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Stephen Ayres to 60 days incarceration, one year supervised release, 60 hours community service, and $500 in restitution.

**I.       Introduction**

Stephen Ayres, 39, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.7 million in losses.[1]

---

[1] Although the Statement of Offense in this matter, filed on June 8, 2022, (ECF No. 64 at ¶ 6) reflects a sum of more than $1.4 million for repairs, as of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Defendant Ayres pleaded guilty to one count of violating 18 U.S.C. § 1752(a)(2), disorderly or disruptive conduct in a restricted building or grounds. As explained herein, a sentence of 60 days is appropriate in this case based on Ayres's: (1) statements on Facebook, prior to January 6, that members of Congress, Chief Justice John Roberts, and Vice President Michael Pence had committed treason and were now put on notice by "We The People""; (2) entry into the Capitol and posting to Facebook of images of the riot; and (3) agreement with another person, in a YouTube video posted after the attack, that "The purpose of today was to expose Pence as a traitor" and "the American people are not going to let this slide" – all words that incite violence.

The Court must also consider that Ayres's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police breach the Capitol, and disrupt the proceedings. *See United States v. Thomas Fee*, 1:21-cr-00131 (JDB), Tr. 04/01/2022 at 17 ("The defendant was an active participant in a mob assault on our core democratic values and our cherished institution. And that assault was intended by many and by the mob at large in general to interfere with an important democratic processes of this country. I cannot ignore that, cannot pull this misdemeanor out of that context.") (statement of Judge Bates). The defendant's actions and those of his fellow rioters enabled the breach the Capitol, threatened the lives of the police officers, legislators and their staffs, and disrupted the certification vote for several hours. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).  Accordingly, as explained more fully below, the government believes that a sentence of incarceration is appropriate in this case.

## II.      Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 21 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent— contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Ayres's conduct and behavior on January 6.

*Ayres's Role in the January 6, 2021 Attack on the Capitol*

On or about January 5, 2021,  Ayres traveled from Ohio to Washington, D.C., via automobile.  The purpose of his trip was to protest Congress' certification of the Electoral College.

Importantly, prior to January 6, Ayres made several posts on his Facebook account revealing the purpose of his trip.  In particular, in a post made on January 2, 2021, Ayres stated: "History is being made right in front of your eyes! When your grandchildren ask "Where were you when...........happened?" What's your answer going to be?" The post attaches an image of a poster stating, "January 6th Washington, DC, the president is calling on us to come back to Washington on January 6th for a big protest – 'Be there, will be wild.'"

In addition, in a post on January 3, 2021, Ayers stated: "Mainstream media, social media, Democrat party, FISA courts, Chief Justice John Roberts, Joe Biden, Nancy Pelosi, etc....all have committed TREASON against a sitting U.S. president!!! All are now put on notice by 'We The People!'"

 

*Figure 1*                                          *Figure 2*

On January 6, Ayres attended the "Stop the Steal" rally and then marched with other protestors to the Capitol.  At about 2:30 p.m., Ayres was part of the crowd that had gathered outside the Senate Wing Doors of the Capitol.  At approximately 2:50 p.m., Ayres sent the picture above on the left (Figure 1) to another Facebook user.  He later messaged the same user that: "Some cops already stood down and took their gear off in our favor."  At approximately 2:51 p.m., a few minutes after rioters had breached the make-shift barricades set up by Capitol police officers, Ayers entered the Capitol through the Senate Wing Doors.

He remained inside the Capitol for some time.[2]  Ayres joined with others in chanting and parading inside the Capitol.  At approximately 6:15 p.m., Ayres posted a video to Facebook of rioters storming the Capitol (Still Photo Above--Figure 2).  Still photos form the Senate Wing video surveillance system showing defendant Ayres are included below.

  

On January 7, 2021, a video was posted to YouTube showing Ayres, another male individual (Male 1) and a female inside a hotel room after the riot.  Male 1 stated:  "It's not over, trust me.  The purpose of today was to expose Pence as a traitor," and the female  responded that that "the American people are not going to let this slide, especially after today." Ayres responded, "yup." Ayres stated that the "fake news" would not accurately report on what happened at the Capitol but that they had "seen it all" and they "got footage all over the place on the Capitol" and that they would "probably share some of it here and there."

---

[2]   Ayres agreed in the Statement of Offense that he stayed in the Capitol for approximately ten minutes.  However, as discussed below, in July 2022, Ayres testified before the House Select Committee to Investigate the January 6th Attack on the Capitol.  During his testimony, Ayres was asked what made him decide to leave the Capitol. Ayres replied that "Basically when President Trump put his tweet out, we literally left right after that [came] out."  Former President Trump issued his tweet, telling his supporters to go home, at 4:17 p.m.  Thus, according to his own testimony before the Committee, Ayres was at the Capitol for approximately one and one-half hours.

*The Charges and Plea Agreement*

On January 21, 2021, the United States charged Ayres by criminal complaint with violating 18 U.S.C. §1512(c)(2) and related charges.  On January 25, 2021, law enforcement officers arrested him at his home in Warren, Ohio.   On February 25, 2021, a federal grand jury in the District of Columbia returned a four-count Indictment charging Ayres and Matthew Perna with Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count 1); Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count 2); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count 3); and Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count 4).[3]  On June 8, 2022, Ayres pled guilty to Count Three of the Indictment, charging him with disorderly and disruptive conduct in a restricted building or grounds.

## III.   Statutory Penalties

Ayres now faces a sentencing on a single count of violating 18 U.S.C. § 1752(a). As noted in the plea agreement and by the U.S. Probation Office, Section 1752(a)(2) carries a maximum sentence of one year of imprisonment, a fine of no more than $100,000, and a term of supervised release of not more than one year.  Ayres must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

---

[3]   On December 17, 2021, Perna pled guilty to all counts in the indictment.  On March 9, 2022, the government filed a request for abatement of the prosecution, stating that Perna had died on or about February 25, 2022.  ECF Doc. 49.

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Ayres' adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2A2.4(a)) | 10 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 8 |

*See* PSR at ¶¶ 30-35.

The U.S. Probation Office calculated Ayres's criminal history as a category I. PSR at ¶ 38. Accordingly, the U.S. Probation Office calculated Ayres's total adjusted offense level, after acceptance, at 8, and his corresponding Guidelines imprisonment range at 0-6 months. PSR at ¶ 64. Ayres's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and

adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that *significantly* increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### IV. Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of 60 days incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 was a crime unparalleled in American history and defies comparison to other violent riots. It represented a grave threat to our democratic norms and practices. Indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.

While each defendant must be sentenced based on their own conduct, this Court should take into account that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances. As they entered the Capitol, they very likely crossed through numerous barriers and barricades and heard the violent outcries of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting between the rioters and police and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while assessing Ayres's individual conduct and fashioning a just sentence, this Court should look to a number of critical aggravating and mitigating factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) defendant's reaction to acts of violence or destruction; (5) whether, during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from police officers; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. Had Ayres personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of Ayres is therefore not a mitigating factor in misdemeanor cases.

Accordingly, the nature and the circumstances of this offense establish that incarceration is the appropriate sentence in this matter.

### B.  The History and Characteristics of Ayres

As set forth in the PSR, defendant Ayres has no prior criminal history.  He was employed as a carpenter and cabinet maker and lost his job following his arrest in this case.  In addition, while on pre-trial release for nearly 18 months, he has not violated his conditions of release.  This factor, then, weighs in favor of a lower sentence.

As noted, in July 2022, Ayres testified before the House Select Committee to Investigate the January 6th Attack on the Capitol.  As reported in the press, as Ayres was leaving the hearing room, he apologized to former Capitol Police Officer Aquilino Gonell and Washington Metropolitan Police Officer Daniel Hodges, who were seated in the audience behind Ayres.  Asked later about Ayres's apology, Officer Gonnell said, "I accepted his apology.  I am not a vindictive person.  Somehow he still [has] to answer to the judge criminally and also to his Maker.  But I think that apology should have been directed first [to] Erin Smith, the widow of Jeffrey Smith from MPD, who was sitting right next to me yesterday, and he did not bother to stop …. The first person he should have apologized [to] was Erin Smith.  Her husband lost his life ... not because of what [Ayres] did, but because of what he was part of.  …  Whether [Ayres apologized] as a photo op or just looking for leniency [from] the judge, that's not for me to decide."  https://thehill.com/blogs/blog-briefing-room/3557287-officer-says-he-accepted-apology-from-jan-6-witness-who-stormed-capitol/

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.  "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the

democratic process.[4] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic

---

[4] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge

Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to
> attack the Capitol to prevent our elected officials from both parties from performing
> their constitutional and statutory duty, democracy is in trouble. The damage that
> [[Defendant Ayres]] and others caused that day goes way beyond the several-hour
> delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven

months ago for the United States and our diplomats to convince other nations to pursue democracy.

It means that it will be harder for all of us to convince our children and our grandchildren that

democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See United States

v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be

made defending what happened in the Capitol on January 6th as the exercise of First Amendment

rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—

especially those who intend to improperly influence the democratic process—that their actions

will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The government cannot predict whether Ayres is likely to recidivate.   Ayres claimed he

fell for the contentions of others that the election had been "stolen" and acted based on those

false claims.  But having allegedly been fooled once by such claims that were loudly broadcast in

the media and on-line, and with the potential for similar claims in the future by the same actors if

future election results do not go their way, the Court should be concerned that Ayers will stick to

his rather lukewarm response to a question put to him by Representative Liz Cheney whether he

still believed the election was stolen. Ayres replied, "Not so much now.  I got away from all of

the social media ...."  Thus, the government's request for a sentence of incarceration is based on the need for general deterrence, and not a concern for specific deterrence.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[5] This Court must sentence Ayres based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot. Although those like Ayers convicted of misdemeanors are generally less culpable than defendants convicted of felonies, misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes. A probationary sentence should not be the default.[6]  *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth at sentencing). Accord, *United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 (statement of Judge Friedman).

---

[5] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[6]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

Ayres has pleaded guilty to Count Three of the Indictment, charging him with Disorderly or Disruptive Conduct in violation of 18 U.S.C. § 1752(a) This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), apply.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. Avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against police officers,

15

and large number of victims. Thus, even though many of defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

Of the hundreds of persons charged in the January 6 attack on the Capitol, very few have pled guilty to, and been sentenced for, a single count of violating Section 1752(a)(2). Those few cases have generally involved aggressive conduct by the defendant not present in this case (such as throwing objects at the police, trying to grab an officer's baton, and the like) – and the government has asked for sentences of approximately 12 months' incarceration in those cases, significantly more than it seeks here.

For example, in *United States v. Matthew Baggott,* 1:21-cr-411-02, the government sought a sentence in the middle of the guideline range of 8 to 14 months (effectively 10 months' incarceration, because the statutory maximum sentence for a violation of Section 1752 is 12 months' incarceration). Baggott was part of a crowd under the scaffolding on the Northwest Stairs that taunted police, sprayed substances at them, and attempted to physically breach the metal barricades that had been set up for the protection of the officers, the building, and those inside. Prior to his entry into the Capitol, Baggott threw an object at the Capitol Police at the top of the Northwest Stairs. He then entered the Capitol as part of the first wave of rioters to breach the Senate Wing Doors, pumping his fist in the air prior to entering; remained in the Capitol for more than 40 minutes, during which time he went to the Crypt, the Rotunda, and Statuary Hall; confronted police in the Ohio Cloak Corridor; and grabbed an officer's baton but did not succeed in taking it. The court imposed a sentence of three months' incarceration, significantly below the advisory guideline range.

Similarly, in *United States v. Dennis Sidorski,* 1:21-cr-48 (ABJ), the government sought a sentence of 12 months' incarceration, the bottom of the 12 to 18 month advisory guideline range applicable in that case.  Sidorski – wearing a sweatshirt with AMERICAN SUPREMACIST written on it – went to the Capitol.  Outside the Capitol, he made unwarranted contact with a police officer, putting his hand on the officer's shoulder and arm for approximately three seconds.  He then scaled a wall near Northwest scaffolding; entered the Senate Wing Door at 2:14 p.m., approximately one minute after it was first breached; walked through or remained in the Rotunda, Statuary Hall, the Upper House Doors, and a suite of offices of Speak of the House Nancy Pelosi (where he remained for six minutes); and was present in the Crypt when a line of police officers was forced to fall back due to the unruly mob.  Later, after seeing his image on TV, Sidorski threw away his distinctive sweatshirt and deleted his Facebook account.  The court imposed a sentence of 100 days' incarceration, significantly below the advisory guideline range.

In this case, which lacks the aggravating factors present in the cases above, the government asks for a sentence of 60 days, substantially less than it has sought in other Section 1752 cases.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

**V.  Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Ayres to 60 days incarceration, one year supervised release, 60 hours community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      */s/ Nihar R. Mohanty*
Nihar R. Mohanty
Assistant United States Attorney
D.C. Bar No. 436-686
601 D Street, N.W.
Washington, D.C.  20530
(202) 252-7700
Nihar.Mohanty@usdoj.gov

**CERTIFICATE OF SERVICE**

On this 15th day of September, 2022, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

*Nihar Mohanty*
Assistant United States Attorney