UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No.   21-cr-156 (JDB) |
| STEPHEN AYRES | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Stephen Ayres, through his attorney, Eugene Ohm, hereby submits the following memorandum in aid of sentencing in this matter.  Mr. Ayres respectfully requests that this Honorable Court follow the recommendation of U.S. Probation and sentence him to a period of probation and community service.

Mr. Ayres is a forty-one year old man with no criminal history.  He is a devoted husband and father to a one-year-old boy, Leonidas, and his ten-year-old stepson, Waylan..  At the time of his arrest, he was working as a supervisor for KraftMaid Cabinetry, a cabinet manufacturer.  Because of his mistakes on January 6th, he was terminated from that job – a place he had worked for twenty years, beginning in high school.This termination – and more specifically, his mistake on January 6th –wreaked havoc on Mr. Ayres' life.  Mr. Ayres's new wife was 7 months pregnant at the time of his arrest.  After maternity leave, she had plans on going to nursing school that were postponed.  The new family also saw their primary income vanish when their new son arrived.  And while Mr. Ayres is grateful, in hindsight, for circumstances that allowed him to be with his son through this time, he is

1

deeply embarrassed and disappointed that he placed his new family at risk.  He is gravely disturbed that he was not earning a paycheck when he welcomed his son home.

Mr. Ayres has also suffered emotionally from his involvement with the Capitol breach.  His co-defendant and high school friend, Matthew Perna, took his own life largely because of the pressures of this case.  Mr. Ayres thinks of Mr. Perna, who conveyed to him that he felt responsible that Mr. Ayres had been charged,every day. Mr. Ayres wonders whether and to what extent Mr. Ayres' circumstances contributed to Mr. Perna's depression.

Still, Mr. Ayres has done his best with his situation.  He became a stay-at-home father and has taken steps to start his own home improvement business. His wife has begun nursing school and the family is beginning to recover from the substantial consequences of his mistakes.

Mr. Ayres has spent considerable time reflecting on what led him to be part of January 6th - how his loyalty and fealty to a president somehow led him to becoming, to the world, an insurrectionist. He is deeply ashamed to be categorized as rioter who attacked the Capitol.  He has since made a clean break from politics – though he still identifies as a conservative and a Republican, he no longer follows politics closely and is off social media entirely.  He recognizes the deep divisions that still exist in politics and has determined that extracting himself from them is the only way to ensure that he remains focused on what is and has always been his greatest priority – his family.

January 6th was the first political rally that Mr. Ayres attended. Mr. Perna invited him to join family and friends and gave Mr. Ayres a ride. For Mr. Ayres, he wanted to see President Trump speak and had no designs of going to the Capitol. But as he relayed to the Select Committee, former President Trump told him to march to the Capitol. Mr. Ayres waited till the end of the rally and joined the others walking to the Capitol, wondering if the president would be speaking again. He followed the crowd all the way to the doors of the Capitol and then the doors opened.

Mr. Ayres provides no excuse for making the poor choice to walk into the building. But he entered and walked around for about ten minutes, never departing from the velvet ropes from the hallway.[1] Then he left and went outside.

To be clear, Mr. Ayres walked through the U.S. Capitol without disturbing any property, having only positive interactions with police. But he recognizes that his presence alone gave others the ability to do real and substantial harm—to the officers, to the building and to our democracy. And he is profoundly ashamed of the harm that he has caused.

As a result, Mr. Ayres has attempted to demonstrate his remorse to help the nation heal and move forward. He voluntarily testified under oath before the House of Representatives Select Committee— twice by video and once in-person. He did so after hearing that other Committee witnesses and even members had been subject

---

[1] The government misconstrues statements by Mr. Ayres to the Select Committee in its Memorandum. ECF 61 at 6. Mr. Ayres was inside the Capitol building for ten minutes but remained in the general area until the Trump tweet at 4:17.

to threats.  Like them, he became the target of online threats and ridicule from the community.  While he first faced scorn when he was arrested, he was met with anger and was even abandoned by some close to him after he testified.

But Mr. Ayres did what he had to do and became a cooperating witness, albeit in a non-traditional sense.  He was asked to assist the federal government in two important goals: 1) to prosecute other individuals for the aftermath of what happened on January 6th; and 2) to assist the federal government in determining what steps it can take to ensure that this would never happen again.  Mr. Ayres did everything that was asked, providing testimony on three occasions to the Select Committee, travelling to the District twice. In doing so, he courageously provided a public face for those individuals who came to the Capitol but were repentant and remorseful.  He accepted full responsibility but was also unafraid to admit that he hung on President Trump's every word and felt misled.[2] Most importantly, from the Committee's perspective, he provided a voice for those like him – those who trusted a President who betrayed them and suffered very real consequences.  He didn't make excuses - he apologized.  And in the Select Committee's eyes, helped the nation to understand what happened that day.

---

[2] "It makes me mad because I – I was hanging on every word he was saying. Everything he was putting out. I was following it.  I mean, if I was doing it, hundreds of thousands or millions of other people are doing it, or maybe even still doing it.  It's like he just said about that, you know, you got people still following and doing that.  Who knows what the next election could come out, you know.  It could end up being down the same path we are now. I mean, I just don't know." Transcript, January 6 committee hearing, July 12, 2022. https://www.npr.org/2022/07/12/1111123258/jan-6-committee-hearing-transcript

On June 8, 2022, Mr. Ayres pleaded guilty to Entering and Remaining in a
Restricted Building or Grounds, in violation of 18 U.S.C. §1752(a)(1).  The defense
agrees with U.S. Probation's assessment that "Mr. Ayres' culpability appears to be
minimal in contrast with individuals who destroyed or stole government property
and assaulted or threatened the law enforcement officers on that date."  ECF 60 at
2.  Based on all of the factors discussed below, Mr. Ayres respectfully requests that
the Court impose a sentence of probation and that he complete community service.

**BACKGROUND**

At approximately 2:51 pm on January 6, 2020, Stephen Ayres made what he
knows is the biggest mistake of his life. He committed a crime and is deeply
remorseful for his actions.

Mr. Ayres' spontaneous decision to enter Capitol grounds was criminal but it
is important to note that he had no plans to go inside or even to the Capitol.  He
went to the Capitol because he was told to do so.  And his brief time in the Capitol
was a literal walkthrough — he stayed within the ropes the entire time – and he
quickly left when he realized conduct with which he did not want to be associated
was occurring.  He left the building and stayed outside the Capitol.  And at around
4:17 pm, President Trump sent a tweet telling individuals to go home.  When Mr.
Ayres heard that, he decided to leave.  His description to the Committee
demonstrated his thought process when he left:

> That's basically your President, you know, asking you, you know –
> that's how I look at it, like: Hey chill out.  Even though I wasn't really
> doing anything, kind of following that order.  Because he said:  All
> right, guys let's cool it out.  I wish he would have done it, you know, 10
> minutes after he seen what started and what was going on.  But kind

of following that as like, you know, let's get out of here, which I wish it would have been done a little earlier, honestly…. Because I didn't know that was going to break out the way it did.  I wish the moment – my personal opinion, I wish the moment he saw what was happening, I wish he would have come out and he would have posted something like that or did something like that, you know, half-hour after his rally was over because it was getting insane down there.

[Because] I mean unless the people that were really there hell bent on causing trouble; you might not have got them people to calm down. But for people that were like me that were there – we weren't there to cause trouble; we were there to basically be a peaceful protestor – I think that would have really swayed people like me, you know, the guys that were kind of on the sidelines watching the stuff take place.

Transcript, Select Committee Deposition, June 17, 2022.

And for Mr. Ayres, it had the expected effect.  Mr. Ayres left the Capitol grounds moments after the President tweeted those instructions. He now recognizes that he and those like him – those who were there only to voice their opinions – had a purpose for President Trump and the other insurrectionists.

Mr. Ayres also deeply regrets that he posted on social media following January 6th.  In hindsight, he acknowledges that during this entire period he had become swept up with social media, both with absorbing as much information as possible and also making exaggerated statements for the benefit of obtaining "likes."  He has spoken thoughtfully about whether there was a moment where he recognized that he was a "pawn" and that he believed in lies.  And in candor, he does not know if his revelation came when he told his extremely pregnant wife that he had lost his job, when President Biden was inaugurated or when then-President Trump lost his final lawsuit.  But while he has not identified that *moment* of epiphany, he now recognizes the role he played and has expressed his regrets to the

6

nation on television.  He shared his clarity and bravely urged others who had

declared allegiance to a man over country to wake up – to "take the blinders off, and

make sure you step back and see what's going on before it's too late."  Transcript,

January 6 committee hearing, July 12, 2022.

https://www.npr.org/2022/07/12/1111123258/jan-6-committee-hearing-transcript

Mr. Ayres has been working to repent for the ten minutes he spent in the

U.S. Capitol.  He has worked to seek forgiveness from his family – he recognizes

that he jeopardized the future of his wife and baby.  He has worked to seek

forgiveness from his country – he has done all that he can to help the House of

Representatives Select Committee in their mission to prevent this from happening

again.  After the television cameras were turned off, he apologized to police officers

who were injured on January 6th and Officer Jeffrey Smith's widow, in hopes of

eventually earning their forgiveness.[3]  Astonishingly, his apology was reportedly

the first time that those officers had ever received an apology for January 6th from

anyone.  Having taken responsibility for his own actions and acknowledging the

---

[3] The government's memorandum cynically suggests that Mr. Ayres was somehow
wrong to apologize to the officers at the conclusion of the hearing.  ECF 61 at 11. To
begin, Mr. Ayres wholeheartedly agrees that he should first have apologized to Ms.
Erin Smith, Officer Smith's widow and he apologized to her moments later after
learning who she was.  Mr. Ayres also agrees that he is not entitled to the officers'
forgiveness.  Mr. Ayres was not aware that the officers were at the hearing until
they were announced after he testified and felt compelled to apologize to them
personally for the harm to which he had contributed.

Mr. Ayres has also declined dozens of requests for interviews with the media.

greater harm that his presence in the Capitol brought upon this country, he now seeks forgiveness from this Court.

## ARGUMENT

### I.      Legal Standard

The Court is well aware that the Supreme Court's opinions in *Kimbrough v. United* States, 552 U.S. 84 (2007), and *Gall v. United States*, 552 U.S. 38 (2007), have dramatically altered the law of federal sentencing.  Congress requires federal courts to impose the least amount of imprisonment necessary to accomplish the purposes of sentencing as set forth in 18 U.S.C. §3553(a).  Those factors include (a) the nature and circumstances of the offense and history and characteristics of the defendant; (b) the kinds of sentences available; (c) the advisory guideline range; (d) the need to avoid unwanted sentencing disparities; (e) the need for restitution; and (f) the need for the sentence to reflect the following: the seriousness of the offense, promotion of respect for the law and just punishment for the offense, provision of adequate deterrence, protection of the public from future crimes and providing the defendant with needed educational and vocational training, medical care, or other correctional treatment.  *See* 18 U.S.C. §3553(a).

### II.     Imposing a Sentence of Probation is Sufficient, But Not Greater Than Necessary, to Comply with 18.U.S.C. §3553(a).

The Defense concurs with U.S. Probation Office's recommendation of a period of probation.

Mr. Ayres, in the end, committed a trespassing offense and should be sentenced as such.  The government points out that amongst trespassing offenses, it is among the most serious, but that is true of all of the nearly 900 defendants charged in these cases.  The government's prosecution decisions have clouded what distinguishes between plea offers to petty misdemeanors or Class A misdemeanors. And while  the investigation into this case is unprecedented, the same sentencing factors that apply in any other trespassing case apply here.  Mr. Ayres accepted responsibility for his actions and showed genuine remorse.  He has been entirely compliant on pretrial release and has cooperated with the federal government – an action that both demonstrates his rehabilitation but also deserves a degree of additional leniency. He has suffered personally and financially.  His reputation has been assaulted from all sides, in part because of his willingness to assist the government and the nation in a much needed healing.  He has no criminal history, he has become gainfully employed. He is by all accounts, a good family man who made a mistake.  He should be sentenced accordingly and be ordered to serve a period of probation.

### a.  Mr. Ayres' Personal History and Characteristics

Stephen Ayres grew up under the care of a hard-working single mother in a working class environment.  He had no relationship with his father, who left the family when he was an infant.  When he reached his teenaged years, he recognized the need to contribute to the family so he found an entry level job with a cabinet company.  He excelled at that job and worked there for twenty years. At the time of

his arrest, he had been elevated to supervisor and was responsible for twenty-five associates.

Mr. Ayres is married to Hayle Allison.  Their wedding plans were cancelled because of the pandemic but they ultimately exchanged vows in a private ceremony not long before January 6th.  They were blessed with a baby boy, Leonidas, who was born two months after Mr. Ayres' arrest.  Ms. Allison also has a son from a previous marriage named Waylon who Mr. Ayres loves as his own child.

Between his teenaged years and his marriage, Mr. Ayres has struggled, but met every challenge.  He became addicted to opiates after an accident in his early twenties.  He successfully completed inpatient treatment fifteen years ago and has been sober ever since.  This experience gave him the courage to handle his recent challenges and the confidence to confront those who disagreed with his testimony before the Select Committee.   It also provided him perspective.  He has said to counsel on many occasions, "I'm so mad at myself.  I had hit rock bottom when I was young and crawled all the way back.  And then I messed it all up again."

Since that mistake, Mr. Ayres has refocused on the things that matter most to him.  By all accounts, Mr. Ayres is an exceptional parent and spent the time after his termination raising an infant and stepson while his wife worked and began school.  He is a devout Christian and known to be a caring neighbor and friend.  He moved homes in order to have his aging mother live with his family.  He recently began to do contractor work in hopes of starting his own business.

Mr. Ayres is a good man who has acknowledged the mistake he made by entering the Capitol on January 6th. He has since cooperated with the federal government with no promises or benefits – and apparently no acknowledgment by the prosecution for his efforts.

### *Mr. Ayres' Cooperation*

It cannot reasonably be disputed that Mr. Ayres has done everything that he could to atone for his actions. He participated with the FBI when he was arrested. He spoke to the Select Committee of the House of Representatives and their investigators on four occasions. He was told that the Select Committee was investigating how this event could have occurred and how a future event could have been prevented. He was warned that there would be no benefit promised for meeting with the Committee and, in fact, he could be further prosecuted if they learned of new information. He was provided no protection, no debriefing letter and no immunity. He participated enthusiastically and reported every aspect of everything that he knew.

This meeting was successful and the Select Committee investigators asked him to return for a second transcribed deposition. Mr. Ayres again cooperated, this time with more senior members of the Investigative Team. He answered questions for nearly two hours. He voluntarily came to the District to answer questions in person. And a week later, he shared his testimony with the world.

In doing so, Mr. Ayres suffered even additional consequences – as his wife Ms. Allison reports, they have received threats in the mail and on social media and

have been ostracized by some friends and family.  The local police patrols his

neighborhood to provide additional security.  Mr. Ayres recognizes that these are

costs for his crime.  But he has made a clean separation from his past actions and,

in doing so, shown a path to others in this country to begin the slow healing process

that the nation desperately needs.  In addition, his public testimony with the Select

Committee surely encourages others to come forward.  As he has shown, he

recognizes the need to do whatever he can to heal the wounds inflicted on that day.

The government has continuously taken the position that individuals who

cooperate with the House Select Committee should receive no benefit, despite

criticism from the District Court and without logical explanation.  Chief Judge

Howell has admonished: "I do think that it is an important indication of the – in a

concrete way of remorse, acceptance of responsibility, to help if not the executive

branch of government, in the context of cooperating with a law enforcement arm to

the Department of Justice of the U.S. Attorney's Office, to help another branch of

government, a congressional committee doing an investigation, and I have given

credit; I think that it is an important factor to consider in sentencing."  ECF 90 at

48-49, Transcript of Sentencing Hearing, *United States v. Robert Schornak¸*21-cr-

278 (BAH).

### b.  Nature and Circumstances of the Offense

Although Mr. Ayres has taken responsibility for illegally entering the Capitol

building, there are a number of reasons why this factor weighs in favor of a

sentence short of incarceration.  Mr. Ayres had no plans to go to the Capitol.  And

he did not engage in any violence or destruction that day.  He did not dress for violence.  He did not confront any police officers.  He did not go into any restricted areas.  He did not encourage anyone to do anything.

On the days leading up to January 6th, Mr. Ayres was invited by his high school friend to join a group to go to the rally in support of President Trump.  He had been paying close attention to social media reports that then-President Trump had won the election.  He believed President Trump's rhetoric that voting machines were missing and he anxiously awaited the results of lawsuits filed by the president to demonstrate election fraud.  He trusted that the evidence would surface, as the president promised.  He "hung on every word."

Mr. Ayres came to the District to go to the rally in support of then-President Trump only – he had never seen a rally in person and he wanted to demonstrate his support.  He had no interest in disrupting the certification vote. He had no intention to go to the Capitol until he was told to go to the Capitol by the then-President and saw everyone else walking towards the Capitol. If the then-President had told him to go to White House, the Lincoln Memorial or the courthouse, that is where he would have gone.

It is undisputed that in the ten minutes that he was inside the Capitol building and in the time he was in Washington D.C., Mr. Ayres did not engage in any assaultive, physical or destructive acts or even so much as shout.  He was cooperative and polite with all of the police he encountered.  He did not enter any sensitive areas and in fact dutifully stayed within the velvet ropes.

Mr. Ayres did however post messages about entering the Capitol.  He posted a video with others with whom he attended and agreed with statements he now knows to be untrue.  He deeply regrets those messages and has had no social media activity since January 2021.

Mr. Ayres accepts responsibility for the misdemeanor unlawful entry but, to be clear, that is all that he did.  Qualitatively, his conduct is no different than many of the Petty Misdemeanor offenses.  In fact, in applying the rubric cited by the U.S. Attorney's Office, it is clear that Mr. Ayres is at the low end of the spectrum for any of the prosecuted offenses.  In each of its Sentencing Memoranda, the government has forcefully argued:

> Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

See e.g. *United States v. Lentz*, 22-cr-53 (RDM) at 30.

Mr. Ayres walked into the building through a door, without using any force; he encouraged no violence or property destruction and was not in the immediate vicinity of any violence or destruction; he did not destroy evidence; he was in the building for ten minutes and stayed within the velvet ropes the entire time; he did

not approach any restricted or sensitive areas; he cooperated with law enforcement and the government; and he has demonstrated his contrition in the most significant way possible.

   c. **The Need to Promote Respect for the Law, Provide Just Punishment, Protect the Community and Provide Adequate Deterrence, and the Need to Avoid Unwanted Sentencing Disparities**

Based on Mr. Ayres' personal history and characteristics, it is clear that his conduct on January 6, 2021 was an isolated event that was completely out his character.  It is also extremely unlikely that he will recidivate given his lack of criminal history and his perfect record on pre-trial supervision for the past two years.  Any potential for recidivism can be addressed by the probationary sentence and community service recommended by the defense.

United States Probation has recommended a sentence of probation and the Defense joins in that recommendation.  The government recommends a severe sentence of 60 days of incarceration.  The government's proposal incorporates no leniency for Mr. Ayres despite his brave cooperation, whichhas earned him scorn from relatives and threats from strangers.

When weighed against other cases, Mr. Ayres' conduct is more suitable for a sentence that spares him of incarceration.   The government's recommendation has no support when analyzing past sentences and its imposition would result in a drastic disparity in sentencing.

To begin, there is no particular rhyme or reason as to why Mr. Ayres was required to plead to the 1712(a)(1) offense as opposed to the 5401 parading offense.

However, it is worth noting that of the 27 cases where the defendant has been

sentenced for only the 1712(a)(1) offense, only 7 of the 27 cases either match or

exceed the government's request for 60 days.  And those cases contain facts that

explain the outlier sentence that do not apply to Mr. Ayres.[4]

---

[4] Billy Knutson (6 months)  was a Proud Boy advocating gun violence who
had 6 convictions including multiple violent felonies, *United States v. Billy
Knutson*¸22-cr-0031 (FYP); Bryan Betancur (4 months)  was on probation for
burglary at the time of the offense, entered a sensitive area, displaced furniture to
use them as weapons and was uncooperative with the presentence report process,
*United States v. Bryan Betancur*¸21-cr-51 (TJK); Lawrence Baranyi (90 days)  had
made plans to return to the District for the inauguration and was intercepted by the
FBI, *United States v. Lawrence Baranyi*¸21-cr-62; Simone Gold (60 days) gave
multiple speeches inside the Capitol, refused to obey repeated officer commands and
joined a group that aggressively pushed officers, *United States v. Simone Gold*¸21-
cr-85 (CRC); Blake Reed (42 days) joined a group trying to break into the House
chamber with members trapped inside, *United States v. Blake Reed*, 21-cr-204
(BAH); Kelly O'Brien (90 days) entered into the Speaker's Suite, encouraged others
to "smash this place" and had prior convictions; Adam Johnson (75 days) went to
the door of the House chamber, attempted to open the Speaker's door and
encouraged rioters to use a statue as a battering ram, *United States v. Adam
Johnson*, 21-cr-648 (RBW); Derek Jancart (45 days for 5104 charge) and his
codefendant screamed "We have you surrounded!" at officers and took a bicycle rack
to scale a wall.  They spent nearly 40 minutes inside the Capitol and one entered
the Speaker's Conference Room while his codefendant photographed him - they also
brought a gas mask, two way radios, Kevlar gloves and a medical kit and appeared
to be aiding other insurrectionists on January 6th by posting on social media that
there was "little sniper coverage" on the roofs of the surrounding buildings, *United
States v. Derek Jancart*, 21-cr-148 (JEB);  Bradly Rukstales (30 days for 5104
offense) threw a chair at police officers and was dragged from the Capitol, *United
States v. Bradly Rukstales*, 21-cr-41 (CJN);  Gracyn Coutright (30 days) went onto
the Senate floor where the certification was to have taken place and attempted to
steal a flag, *United States v. Gracyn Coutright*, 21-cr-72 (CRC); Robert Schornak (28
days) came dressed in a helmet and flakjacket and stole a flag, *United States v.
Robert Schornak*, 21-cr-278 (BAH) (giving credit for cooperating with the federal
government by speaking with the Select Committee); Leonard Ridge (14 days) told a
friend that he was trying to block the session of Congress, *United States v. Leonard
Ridge*¸21-cr-406 (JEB); William Tryon (30 days) was among the first to breach the
East side of the Capitol and pushed through despite being sprayed and struck with
a baton and was forced to leave by police, *United States v. William Tryon*, 21-cr-278

Although no defendant has cooperated in the manner that Mr. Ayres has, his facts demonstrate less culpability than even the 1752(a) cases in which individuals have received straight probation.   Rachel Pert was sentenced to probation despite admitting that she was trying to "storm them to stop the vote." *United States v. Rachel Pert¸*21-cr-139 (TNM). Jeffrey Witcher was sentenced to probation despite "penetrat[ing] the Crypt portion of the U.S. Capitol, where violence between rioters and law enforcement was occurring around him" and deleting evidence from his phone, *United States v. Jeffrey Witcher¸*21-cr-235 (RC), ECF 39 at 2.  Kevin Cordon received probation despite entering the Capitol wearing body armor and a gas mask, *United States v. Kevin Cordon*, 21-cr-277 (TNM).  Verden Nalley received probation despite spending 30 to 40 minutes in the Capitol and threatening to "be back with guns in two weeks", *United States v. Verden Nalleyi,* 21-cr-116 (DLF) ECF 93 at 2.  Jenny Cudd received probation despite wearing bulletproof sweatshirt, pushed against police yelling "go" and "charge," *United States v. Jenny Cudd*, 21-cr-68 (TNM) ECF 90 at 2.[5]

---

(RBW); Matthew Baggott (3 months) assaulted police officers and grabbed an officer's baton while inside the building (triggering the 3 point physical contact enhancement), was inside for 40 minutes and had to be removed from the Capitol. *United States v. Matthew Baggott*, 21-cr-411 (APM) ECF 67 at 2; Dennis Sidorski (100 days incarceration) scaled a wall, gained entry in to the Speaker's suite and destroyed evidence.  *United States v. Dennis Sidorski*, 21-cr-48 (ABJ).

[5] There are other cases in which the defendant's conduct was substantially worse than Mr. Ayres but were allowed to plead to the 5104 offense and received no jail time.  Jacob Wiedrich (3 months home detention for 5104 offense) stole a flag and led a charge pushing in doors past the police *United States v. Jacob Wiedrich*, 21-cr-581 (TFH); Leonard Gruppo (3 months home detention for 5104 offense) refused to leave despite repeated commands by Capitol police, *United States v.*

To summarize, these defendants all engaged in an aggravating act that does not apply here. Unlike other defendants who have received sentences of incarceration, Mr. Ayres was not in the District to stop the certification, he did not assault anyone, he did not encourage violence or property destruction, he was not part of the initial breach, he stayed in the building for minimal time, he engaged with the officers in a friendly manner, he did not destroy evidence and he did not go to a particularly sensitive area when he was inside a building. He has been entirely compliant on pretrial release. He was cooperative with law enforcement on that day and has since done everything that he can to voluntarily assist the Select Committee since. He is sincerely remorseful. Incarceration is not necessary to adequately punish him and a sentence of incarceration would fall outside the government's proposed rubric and thus create an unwarranted sentencing disparity.

## CONCLUSION

For the reasons stated above, Mr. Ayres respectfully requests that the Court impose a period of probation and complete a period of community service. Mr. Ayres also requests that a fine not be imposed in light of his obligation to pay $500 restitution.

---

*Leonard Gruppo*, 21-cr-391 (BAH); Jordan Stotts (2 months home detention for 5104 offense) scaled a wall to access the Capitol, *United States v. Jordan Stotts* 21-cr-272 (TJK).

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Eugene Ohm
Assistant Federal Public Defender
625 Indiana Ave. NW, Ste. 550
Washington, D.C. 20004
(202) 208-7500
Eugene_ohm@fd.org